1
2
3
4
5
6
7
8
9
10
11
12

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION**

13

| | | |
|---|---|---|
| ZOUKA MAKSOUD ROSEN, | ) | Case No. CV 13-06229 (AS) |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION** |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

14
15
16
17
18
19
20

**PROCEEDINGS**

21
22
23

     On September 3, 2013, Plaintiff filed a Complaint seeking review of the denial of her application for Disability Insurance Benefits. (Docket Entry No. 3.)  The parties consented to proceed before the undersigned United States Magistrate Judge.  (Docket Entry Nos. 9-10). On January 3, 2014, Defendant filed an Answer along with the Administrative Record ("AR").  (Docket Entry Nos. 13-14).  The parties filed a Joint Stipulation ("Joint Stip.") on April 21, 2014, setting forth their respective positions regarding Plaintiff's claims. (Docket Entry No. 17).

24
25
26
27
28

The Court has taken this matter under submission without oral argument.  See C.D. Cal. L.R. 7-15; "Order Re: Procedures in Social Security Case," filed September 11, 2013 (Docket Entry No. 7).

## BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On May 6, 2011, Plaintiff, formerly employed as an office clerk for an appraisal company and a receptionist at an entertainment company (see AR 33, 36, 105, 113), filed an application for Disability Insurance Benefits, alleging an inability to work since April 16, 2010.  (AR 56, 86-91).  On June 28, 2012, the Administrative Law Judge ("ALJ"), James Goodman, heard testimony from Plaintiff and Plaintiff's husband. (See AR 26-54).  On July 20, 2012, the ALJ issued a decision denying Plaintiff's application.  The ALJ determined that Plaintiff had severe impairments -- degenerative disc disease of the lumbar spine with mild spondylosis, and synovitis of the right knee with likely nerve injury[1] -- but found that Plaintiff was not disabled within the meaning of the Social Security Act.  (See AR 11-19).

Plaintiff requested that the Appeals Council review the ALJ's decision.  (AR 6).  The request was denied on July 15, 2013.  (AR 1-3). The ALJ's decision then became the final decision of the Commissioner, allowing this Court to review the decision.  See 42 U.S.C. §§ 405(g); 1383(c).

///
///
///

---

[1]   The ALJ found that Plaintiff's right shoulder issue, fibromaylgia, and depression were not severe impairments.  (See AR 14).

**PLAINTIFF'S CONTENTION**

Plaintiff alleges that the ALJ erred in failing to: (1) properly consider Plaintiff's testimony and make proper credibility findings; (2) properly consider the lay witness testimony of her husband; and (3) obtain vocational expert testimony. (See Joint Stip. at 3-12, 18-22, 25-29, 31).[2]

**DISCUSSION**

**A.   The ALJ Did Not Err In Finding Plaintiff Not Fully Credible**

Plaintiff asserts that the ALJ failed to provide clear and convincing reasons for finding Plaintiff not fully credible. (See Joint Stip. at 3-12, 18).   Defendant asserts that the ALJ properly assessed Plaintiff's credibility.   (See Joint Stip. at 12-18).

Plaintiff made the following statements in a Pain Questionnaire dated July 4, 2011:

(1) since April 16, 2010, she has pain all over her body, specifically, her right hip, right shoulder, right knee, left ankle and lower back; (2) the pain is brought on by walking sleeping, and sitting (sometimes), and lasts for hours and/or days; (3) sitting on the couch often helps her back and knee pain; (4) she takes hydrocodone, 1 tablet two to thee times a day, for the pain, but the medicine causes constipation, memory loss and an upset stomach; (5) she wears a knee brace and tries to rest to relieve the pain; (6) her usual daily

---

[2]      Plaintiff also alleged that the ALJ failed to fully and fairly develop the record but has not provided any support for this claim in the statement of disputed issues section of the Joint Stipulation. See Joint Stip. at 3, 18.   Therefore, the Court will not address that issue.

activities include house work, shopping (with assistance) and socializing with friends; (7)because of her pain, she can no longer hold a job, drive, pick up boxes, care for her family, cook, clean, or shop; (8) she needs to sit and rest after about 10 to 15 minutes of standing and walking; (9) she is sometimes able to drive to the Post Office or grocery store without assistance (as long as it is a short distance); (10) she is able to walk one block outside her house, to stand 5 to 10 minutes at a time, and to sit 2 to 3 hours at a time; and (11) she needs assistance with dusting, vacuuming, cooking, cleaning the floor and bathroom, and ironing.

(See AR 121-24).

Plaintiff made the following statements in a Function Report - Adult, dated July 4, 2011:

(1) she mostly lays on the couch during the day; (2) she does not take care of anybody else or animals; (3) her condition affects her sleep and she needs to take medicine to sleep and for depression; (4) with respect to her personal care, she needs to sit on the shower floor in order to bathe, and she needs her husband's help in bringing her pills; (5) with respect to meals, she (with assistance and while sitting) can do simple things, i.e., chop, 3 to 4 times a week, which takes 30 to 60 minutes; (6) she cannot cook and clean or do house and yard work; (7) she drives to the church or the post office (short distances) 3 times a week; (8) she shops in the mall 4 times a year, and generally shops by computer; (9) she is able to pay bills, count change, and use bank accounts, but since her condition began she had to be reminded to pay rent or bills; (10) she spends 8 hours a day watching T.V. (not by choice); (11) she cannot ride her bike and it is hard for her to do exercise; (12) she socializes with people 2 times a month at home, and 2 times a week at church (she usually goes

4

with somebody); (13) she sometimes becomes irritable due to pain and depression; (14) since her condition began, she no longer visits people, works, exercises or takes a vacation; (15) her condition affects her abilities to lift, walk, stair-climb, squat, sit, bend, kneel, stand and reach and also affects her memory, concentrate, and her abilities to complete tasks, understand, use hands and get along with others; (16) she can walk 5 to 10 minutes before needing to rest for 45 to 60 minutes; (17) she does not know how long she can pay attention; (18) she sometimes finishes what she starts; (19) she is okay at following spoken and written instructions, but she needed help from her husband in completing this Report; (20) she gets along fine with authority figures; (21) with respect to handling stress, she gets emotional and cries sometimes; and (22) she sometimes (depending on her level of pain) uses a brace (prescribed in 2010) and a cane (prescribed in 2011). (See AR 125-32).

At the hearing on June 28, 2012, Plaintiff testified as follows:

She had received a high school diploma and had attended some college. On April 16, 2010, she left her job as an office clerk for an appraisal company in order to have elective surgery (a bladder surgery). Complications from that surgery resulted in her being hospitalized for 5 nights. Following that surgery, she received physical therapy for about a year and a half. (See AR 32-37). Between April 16, 2010 and May 9, 2011 (when she applied for disability benefits), her physical condition changed a lot. She cannot walk without a right knee brace (her knee buckles), she has a difficult time taking showers (she uses a shower with a shower seat and washes her feet by rubbing them together), putting on makeup, and doing her hair, her entire day-to-day activities

5

have changed; she can stand without her brace for about 3 to 5 minutes and can stand with her brace for about 10 to 15 minutes before experiencing pain; after that time, she has to lie down on the couch, put her feet up, and bend her knee. The longest distance she has been able to walk since May 2011 is about half a block and then she has to get off her knee. (See AR 37-40, 42).

She does not mop or sweep but tries to dust and does not prepare her own meals alone. She has to have help (her friends) cleaning her house. (See AR 40, 43). She takes her medications according to the prescribed dosage and frequency. One of her medications causes her to fall asleep quickly and to stay asleep for a lengthy period. She had sought psychological care but stopped seeing the psychologist about a year ago because she could not afford it. She had been prescribed a psychotropic medication (Cymbalta), but she was no longer taking it. (See AR 40-41).

The ALJ found that Plaintiff had the following residual functional capacity ("RFC")[3]: the ability to lift 20 pounds occasionally and 10 pounds frequently; the ability to stand and walk, with normal breaks, for a total of 4 hours in an 8-hour workday; the ability to sit, with normal breaks, for a total of 6 hours in an 8-hour workday; the ability to push and pull with the right lower extremity occasionally; the ability to climb ramps and stairs occasionally, but never ladders, ropes or scaffolds; the abilities to balance frequently, and to stoop, kneel, crouch and crawl occasionally; and the avoidance of all exposure to extreme cold and hazards, such as dangerous moving machinery and unprotected heights. (AR 15).

---

[3]    A Residual Functional Capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 404.1545(a)(1).

After summarizing the medical evidence in the record (see AR 15-17), the ALJ found that while plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment herein."  (AR 17).

The ALJ elaborated on his credibility determination:

The claimant's credibility is reduced by the lack of objective medical evidence to substantiate her claims.  I note that no examining or reviewing physician has rendered an opinion supporting the claimant's allegations.  In fact, several find her to be much more capable than she claims. [¶] Further, although not clearly malingering, the claimant has been described as exhibiting inconsistent symptoms and behavior on examination (*See* Exhibit 4F at 17).  Efforts to impede accurate testing and evaluation support a finding of poor credibility. [¶] In addition, the claimant's activities of daily living are not consistent with the alleged degree of pain and impairment.  The claimant's activities tend to show that she does have the ability to perform work, if motivated to do so, in that she does some household chores, she is able to prepare meals three to four times with some help from friends, and she claimed she sits when chopping food items. The claimant also stated that she runs errands, she drive her own car short distances to the post office or church, she shops by computer, she can handle money and pay bills, she watches television, and she socializes with friends (Exhibits 4E and 5E).  When, as here, the claimant is able to spend a substantial part of the day in activities involving the

7

performance of functions readily transferable to competitive work, I am entitled to afford little weight to her allegations of disabling pain.   I point out that, in citing this as a credibility factor, I am not saying that the claimant's activities, by themselves, necessarily equate with work activity or show the ability to engage in work.   The ability to engage in some normal daily activities does not prove that one is able to perform competitive work on a regular and continuous basis.   Rather, the claimant's activities suggest two points to me.   First, they suggest that the claimant has better capacities than she has stated in the testimony and written statements.   This, in turn, indicates to me that the claimant has not been completely frank, and makes me cautious about fully accepting the claims advanced. [¶] These factors suggest that the claimant's conditions are not as significant as she alleges.

(AR 17-18).

A claimant initially must produce objective medical evidence establishing a medical impairment reasonably likely to be the cause of the subjective symptoms.   Smolen v. Chater, 157 F.3d 1273, 1281 (9th Cir. 1996); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). Once a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged, and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his pain and symptoms only by articulating clear and convincing reasons for doing so.   Smolen v. Chater, supra; see also Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997).

As set forth below, the Court finds that there was substantial evidence to support the ALJ's finding that Plaintiff's testimony about

the intensity, persistence and limiting effects of the symptoms was not fully credible.[[4]]

Objective Medical Evidence

The ALJ properly considered the lack of objective medical evidence in the record to support Plaintiff's allegations of pain and her functional limitations. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005)("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998).

The ALJ found that the objective medical evidence, including the records from Plaintiff's treating physicians, did not support Plaintiff's testimony about her pain and her limitations resulting from her right knee issue (during a bladder lift surgery on or about April

---

[4]    The Court rejects Plaintiff's contention that the ALJ did not satisfy his duty because he failed to discuss Plaintiff's testimony or identify which portion of Plaintiff's testimony was not credible. (See Joint Stip. at 5, quoting Reddick, supra ["'General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.'"]). Although the ALJ did not recite each and every portion of Plaintiff's testimony, the ALJ did recite key portions of Plaintiff's testimony (see AR 17-18), considered the entirety of Plaintiff's testimony, and made clear what portion of Plaintiff's testimony was not credible (i.e., statements related to the intensity, persistence and limiting effects of the symptoms) and why such testimony was not credible.  Therefore, the ALJ satisfied his duty of making "'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002)).

16, 2010, the surgeon likely nicked a nerve, see AR 34, 196, 211, 214-15, 281). (see AR 15-16).   The record supports this finding.   On April 26, 2010 (10 days after the surgery), Plaintiff's physician, Umakant Khetan, M.D., at HealthCare Partners Medical Group, stated that "[t]he right leg pain is 10% better, and the weakness has improved, but she is almost hobbling, walking with the walker, and sometimes drags her right foot when she gets tired." (See AR 215-16).   On May 17, 2010 (one month after the surgery), Dr. Khetan noted that although Plaintiff "still has significant pain that limits her activity and some swelling," "[s]he is doing physical therapy quite well and successfully and the range of motion of the right leg has improved dramatically," she has shown "tremendous improvement" in her physical therapy exercises, and "[t]he physical therapist suggested aqua therapy or exercises in the water which might expedite her recovery." (See AR 214).   By May 28, 2010, Plaintiff was able to bear weight on her right knee, but she had to use a walker and a knee immobilizer. (See AR 196).

On June 2, 2010, after conducting an orthopedic examination, Dr. Daniel Lee, at Lee Orthopaedic Institute, wrote: "I do not feel any gross instability.   She has difficulty having her knee in a gravity dependent position for more than a minute or so due to discomfort.   She does have active knee extension.   There is no obvious effusion. Palpation reveals only minimal discomfort laterally.   Her range of motion is also difficult to assess because of her pain however zero to 90 degrees is seen in the office.   Distally she does not have any swelling in her leg.   Neurological examination is unremarkable otherwise." (AR 283).   Dr. Lee noted that X-rays did not reveal any obvious abnormality of the right knee, and diagnosed Plaintiff with "[i]nternal derangement of the right knee." (See AR 281-84).

On July 27, 2010, Dr. Khetan placed Plaintiff on temporary disability for a period of three months. (See AR 263).   On November 10, 2010, Plaintiff complained of continued right knee pain and was assessed

10

to have decreased strength in the right lower extremity and knee pain and advised to wear a brace to stabilize. (See AR 201 [progress note]).

On December 10, 2010, following a neurological examination, Bruce Finstead, M.D., found that there was a "lack of neurologic abnormality to account for [Plaintiff's] symptoms" and that he was "not firmly convinced that there is an obturator neuropathy or . . . a lumbar plexitis." (See AR 211-13).

On January 4, 2011, Plaintiff's physician, Richard Graham, M.D., at HealthCare Partners Medical Group, stated that Plaintiff's "opturator nerve symptoms have basically resolved at this time;" that although she continued to complain about pain in her right knee and right lateral hip, the "specific nature of this pain remains unclear at this time;" and prescribed a low-dose medication and referred Plaintiff to a pain clinic. (See AR 208-09). On January 20, 2011, a magnetic resonance scan (MRI) of Plaintiff's right knee showed: "Predominently intrasubstance degenerative tear of the anterior horn of the lateral meniscus with questionable subtle extension to the superior articular surface" and a "[s]mall amount of knee joint effusion." (See AR 222).

On February 3, 2011, following an orthopedic examination, Kathleen Savage, M.D., at HealthCare Partners Medical Group, found that the examination of Plaintiff's right leg pain and weakness in her right leg "is not consistent with any type of neurological injury." (See AR 241-43). On February 4, 2011, an MRI of Plaintiff's lumbar spine showed "[m]ild deenerative lumbar spondylosis and degenerative apophyseal joints arthrosis[.]" (AR 219).

On April 18, 2011, Plaintiff underwent a diagnostic arthroscopy of her right knee with a partial synovectomy. Dr. Lee's postoperative diagnoses was that there was "[n]o sign of a lateral meniscus tear" and

there was "[m]ild synovitis of the patellofemoral join and lateral compartment." (See AR 285-87, 292-97).

A "Medical Source Statement of Ability to Do Work-Related Activities (Physical)" form prepared by Dr. Khetan on February 13, 2012, deferred to the neurological and orthopedic evaluations of Plaintiff with respect to her functional limitations. (See AR 589-93).[5]

Thus, the ALJ properly relied on the lack of objective medical evidence as a basis for partially discrediting Plaintiff's testimony.

Inconsistent Behavior

The ALJ also based his credibility determination on Plaintiff's inconsistent behavior during Dr. Savage's orthopedic evaluation on February 3, 2011. (See AR 243 ["Her gait patten also is not consistent from first observation when she walks in. On manual muscle testing, she is unable to lift her foot, yet she does not have a drop foot at all on a gait pattern."). These inconsistencies between the objective medical evidence and Plaintiff's testimony support the ALJ's credibility determination. See Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (ALJ properly discounted the claimant's credibility after citing the conflict between his subjective complaints and the objective medical evidence). See also Light v. Social Security Admin.,

_____

[5]    As support for her claim, Plaintiff relies, in part, on a March 9, 2012 Single Assessment form on which Michael E. Aldridge, M.D., at Los Angeles County/USC Medical Center, noted that Plaintiff's right knee is within normal limits, except that it buckles with ambulation (see AR 595-96). (See Stip. at 10). That notation, which the ALJ did not discuss, appears to be solely based on Plaintiff's subjective complaints. See Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003)("In interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'"). In any event, the Court finds that the notation does not appear to be inconsistent with the objective medical evidence discussed above and would not have affected the ALJ's determination of Plaintiff's credibility.

119 F.3d 789, 792 (9th Cir. 1997)("In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between her testimony and his conduct, his daily activities, his work history, and testimony from physicians and third parties concerning the nature, severity, and effect on the symptoms of which he complains."). The Court finds that the ALJ properly considered the inconsistent behavior observed by Dr. Savage in making his credibility assessment.

Daily Activities

The ALJ also discredited Plaintiff's credibility based on Plaintiff's ability to perform daily activities such as prepare meals (with some help), chop foods (while sitting), run errands, drive her own car short distances, shop by computer, handle money and pay bills, watch television, and socialize with friends, finding such activities to be inconsistent with Plaintiff's claimed inability to perform work. (AR 17-18). "[T]he claimant's activities suggest two points to me. First they suggest that the claimant has better capacities than she has stated in the testimony and written statements. This, in turn, indicates to me that the claimant has not been completely frank, and makes me cautious about fully accepting the claims advanced." (AR 18). See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)(". . . [T]he ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting . . . . Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of totally debilitating impairment."); Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999)("If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to

discredit a claimant's allegations."). The Court finds that the ALJ's consideration and interpretation of Plaintiff's daily activities is supported by substantial evidence.

**B.   The ALJ Did Not Err in Discrediting Lay Witnesses' Testimony**

Plaintiff asserts that the ALJ failed to properly assess the testimony of Plaintiff's friends (Wayne Hazel, Penny Morelli, Linda White, Jon and Lana Keck, Lorraine Lata), Plaintiff's brother (Rana Awad), Plaintiff's son (Mitchel Rosen), and Plaintiff's husband (Daniel Rosen). (See Joint Stip. at 18-22, 25). Defendant asserts that the ALJ properly discredited the testimony of the lay witnesses. (See Joint Stip. at 22-25).

Plaintiff submitted the following letters from lay witnesses:

> An undated and unsigned letter from Wayne A. Hazel who has known Plaintiff since 1999. He and Plaintiff are members of the same religious organization. (He is the Ministerial Servant, what in other groups is referred to as a Deacon.) When he met Plaintiff, she was a vivacious family woman who cooked and performed many services for the religious community. While at work (i.e., Warner Bros. and her own catering service), she did work requiring great physical mobility. Since April 2010, Plaintiff has become debilitated. When Plaintiff is able to attend services, she struggles to walk, has memory lapses, and suffers extreme pain and stress. He often assists Plaintiff in the most basic things that were once easy tasks for her.

(See AR 177).

> A letter dated June 20, 2012 from Penny Morelli who has known Plaintiff for over 20 years, and that prior to

14

Plaintiff's surgery she used to visit Plaintiff two to three times a week.  For six months after the surgery, Plaintiff was homebound.   During that time, Plaintiff consulted 5 or more doctors and had additional surgery.   Although Plaintiff has adapted to her pain and fatigue, she has developed fibromyalgia, trigger finger arthritis, extreme skin sensitivity and chronic depression.   Plaintiff is unable to take pain medication during the day because of their extreme narcotic effects; she takes them only at night, and then sleeps about 15 hours.   Plaintiff's husband has had to assume most of the household duties such as laundry, cooking, cleaning, shopping and driving.   Plaintiff has been limited in her ability to attend religious services and in her religious obligation to go door-to-door.  (See AR 179).

A letter dated June 25, 2012 from Linda White who has known Plaintiff for about 7 years.   Plaintiff is an outgoing and generous person and is always helping and reaching out to others.   Since the surgery, Plaintiff's activities have been curtailed.   Plaintiff is often in pain, has difficulty walking and sitting, and has to wear a brace for her leg.  (See AR 181).

A letter dated June 26, 2012 from John and Lana Keck who have been friends with Plaintiff since approximately 1972 (when Plaintiff was 11 years old).   Plaintiff has always been positive, active, giving, and supportive in community activities.   Since the surgery, Plaintiff has been in severe pain and has seen many doctors and has tried different prosthetics that did not work.   As a result of her condition, Plaintiff has "virtually stopped her household duties and community services."

15

(See AR 183).

A letter dated June 27, 2012 from Lorraine Lata who has known Plaintiff since 1997, when she worked with Plaintiff at Warner Bros. She and Plaintiff were both interested in physical health and improvement and enjoyed walking together during lunch. Plaintiff used to be active, upbeat, and sociable, but she now is frequently homebound and unable to participate in many day-to-day activities. Since the surgery, Plaintiff has not been able to engage in her "once-loved" catering activities. (See AR 187).

A letter dated June 27, 2012 from Rana Awad, Plaintiff's brother who is also an attorney, which states that Plaintiff, the eldest of six children, was considered the family matriarch. Plaintiff used to be gregarious and vivacious, but since the surgery she has suffered great physical, mental and emotional stress. Plaintiff used to plan and host family events with their large extended family; however, Plaintiff has lost the physical ability and emotional desire to plan and host or even attend such events because of her pain. Plaintiff was not able to attend most of the pre-wedding festivities for their youngest brother in April 2012, which caused her to feel isolated and alone (and thereby, exacerbated her mental depression). Plaintiff managed to attend the wedding (with the help of her family), but she had to leave early because of her pain.
(See AR 185).

An undated letter from Mitchell Rosen, Plaintiff's son, which states that Plaintiff used to be a vibrant person who did everything she could to support the family financially, materially, emotionally and mentally. When his father had

struggled to find work, Plaintiff got a full-time job and took on additional jobs like cooking and cleaning for extra money. Since the surgery, Plaintiff cannot work.  She is unable to stand or lift, and she is unable to set up conferences, meet and greet individuals while walking them to offices, or provide assistance such as taking packages out or getting needed supplies.  Since the surgery, she is no longer able to help family and friends in need (i.e., bring a cooked meal, help go to doctor appointments, or provide home assistance). She is in constant pain.

(See AR 189).

At the hearing, Daniel Rosen, Plaintiff's husband, testified to the following:

For a couple of months after the surgery Plaintiff was bedridden at home and got up to go to the bathroom.  He had to take on the duties of cooking, cleaning and the laundry. Plaintiff used a walker for about a year (and at some point used a wheelchair).  Plaintiff is very depressed and is not able to use her hands in the kitchen (i.e., for cutting). Plaintiff does not drive and they sold her car.  Plaintiff needed to use a chair in the shower for about a year or a year and a half.  He helped her with her medications.  When asked about a change in her condition since April 2010, he stated, "I think it's a matter of where it's the same but it's just something that we have to go forward with."  Plaintiff spends most of her time lying down on the couch, and she has gained a lot of weight.  Plaintiff is able to get up and go to the bathroom and the car and down the stairs (slowly).  The frequency of their sexual relationships has diminished because of her pain.

(See AR 43-53).

The ALJ addressed the testimony of the lay witnesses as follows:

I am also obliged to consider corroborative evidence, especially those witness declarations brought forth by the claimant.  As such, I have considered the statements of the claimant's friends.  Wayne Hazkle (Exhibit 12E), Penny Morelli (Exhibit 13E), Linda White (Exhibit 14E), Jon and Lana Keck (Exhibit 15E), and Lorraine Latta (Exhibit 17E), her sister, Rana Awad (Exhibit 16E), and her son, Mitchel Rosen (Exhibit 18E).  This evidence does not alter my opinion.

The statements are not sworn.  The fact that the declarants could not suffer any consequences as a result of providing false or distorted information is a reasonable basis to question the validity of the reports.  Further, the claimant did not present the declarants as witnesses at the hearing, preventing cross-examination of the allegations. Consequently, the problem noted above was not cured.

The declarants also appear to have a close relationship with the claimant, which may have influenced their desire to help the claimant.  In addition, the declarants can only report their observations of the claimant.  These observations may not be reflective of the claimant's maximal capacities.

Further, many of the statements from these declarants do not support the claimant's allegations; they actually show reasonably normal activities of daily living and functional capacity.  Finally, the accounts conflict with and fail to overcome the probative effect of the medical evidence in this case.

As such, I have given the third party statements of disabling symptoms little weight.

In addition, I also considered the statements of the claimant's husband, Daniel Rosen, who testified at the June 28, 2012 hearing. Again, this evidence does not alter my opinion.

Mr. Rosen's account conflicts with and fails to overcome the probative effect of the medical evidence in this case. Instead, he appears to rely upon his wife's subjective complaints, which are less than fully credible for the reasons stated above. Further, the witness has a financial interest in the outcome of the case as he lives and helps to support the claimant. In addition, Mr. Rosen's observations may not be reflective of the claimant's maximal capacities. Therefore, while I find Mr. Rosen's statements credible to a certain extent, I find his testimony insufficient to support the claimant's limitations as alleged.

(AR 18-19).

The Court finds that the ALJ gave germane reasons for finding the statements of Plaintiff's friends and her son not credible, and for finding the testimony of Plaintiff's husband only partially credible. See Carmickle v. Commissioner, 533 F.3d 1155, 1164 (9th Cir. 2008); Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006); Smolen v. Chater, supra, 80 F.3d at 1288-89. The ALJ properly found that the lay witness statements and testimony about Plaintiff's pain and inability to work conflicted with the medical evidence, as discussed above. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005)(holding that inconsistency with the medical evidence is a germane reason for discrediting the testimony of a lay witness); Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)("The ALJ properly discounted lay

testimony that conflicted with the available medical evidence"). The ALJ properly discredited the testimony of Plaintiff's friends and son based on their "close relationship with [Plaintiff], which may have influenced their desire to help [Plaintiff]" (see AR 18). See e.g., Gregor v. Barnhart, supra (finding that the ALJ properly discounted the testimony of a lay witness who had a "close relationship" with the claimant and was "'possibly influenced by her desire to help [him].'"). Moreover, the ALJ properly found the testimony of Plaintiff's husband to be only partially credible to the extent that it was based on Plaintiff's subjective complaints which the ALJ had found to be less than credible (which the Court has found was a proper credibility determination).[6]

## C.  The ALJ Did Not Fail to Obtain Vocational Expert Testimony

Plaintiff asserts that the ALJ erred in failing to have a vocational expert testify about Plaintiff's ability to perform other work in light of her severe impairments and her non-exertional limitations, with respect to steps four and five of the sequential

---

[6]      The ALJ improperly discredited the testimony of Plaintiff's friends and son by stating that the "declarants can only report their observations of the claimant. These observations may not be reflective of the [Plaintiff's] maximal capacities" and that many of their statements "do not support [Plaintiff's] allegations" (see AR 18). See Valentine v. Commissioner Social Security Admin., 574 F.3d 685, 694-95 (9th Cir. 2009) ("[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition."); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987)("[D]escriptions by friends and family members in a position to observe [Plaintiff's] symptoms and daily activities have routinely been treated as competent evidence."). Moreover, the ALJ also improperly discredited the testimony of Plaintiff's husband by stating that he "has a financial interest in the outcome of the case" and that his "observations may not be reflective of the claimant's maximal capacities" (see AR 18-19). See Valentine, supra; Sprague, supra. However, in light of the Court's determination that the ALJ's other reasons for finding Plaintiff's friends and son not credible and finding Plaintiff's husband partially not credible were proper, such errors were harmless. See Carmichael v. Commissioner, Soc. Sec. Administration, 533 F.3d 1155, 1162-63 (9th Cir. 2008); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

evaluation process. (<u>See</u> Joint Stip. at 25-29, 31). Defendant asserts that the ALJ was not required to call a vocational expert to testify after finding that Plaintiff was capable of performing her past relevant work. (<u>See</u> Joint Stip. at 29-30).

Once the ALJ has determined the claimant's RFC, the ALJ proceeds to step four to assess whether the claimant is able to do any work that he or she has done in the past, defined as work performed in the last fifteen years prior to the disability onset date. If the ALJ finds that the claimant is not able to do the type of work that he or she has done in the past or does not have any past relevant work, the ALJ *then* proceeds to step five to determine whether -- taking into account the claimant's age, education, work experience and RFC -- there is any other work that the claimant can do and if so, whether there are a significant number of such jobs in the national economy. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999); 20 C.F.R. § 404.1520(a)(4)(iii)-(v); <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998); 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. <u>Tackett</u>, 180 F.3d at 1098; <u>Lewis v. Apfel</u>, 236 F.3d 503, 517 (9th Cir. 2001).

The Commissioner may make the step five determination by using the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has solely exertional (strength-related) limitations, the ALJ must apply the Grids, which will direct a finding of disabled or not disabled. 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(a). When a claimant has both exertional and non-exertional limitations, the Grids are inapplicable, and the ALJ must take the testimony of a vocational expert. <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing <u>Burkhart v. Bowen</u>, 856

F.2d 1335, 1340 (9th Cir. 1988)[The "[G]rids are inapplicable when a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range or work permitted by the claimant's exertional limitations."]); Hoopai v. Astrue, 499 F.3d 1071, 1076 (9th Cir. 2007) ("A vocational expert is required only when there are significant and 'sufficiently severe' non-exertional limitations not accounted for in the grid.").

The ALJ made the following determination at step four of the analysis:

> The record and testimony reveal that the claimant worked as a Receptionist at an entertainment company from 1997 through November 2004 (Exhibits 2E at 3 and 3E).[7] She described this work as medium, as she had to lift up to fifty pounds (Exhibit 3E at 4).[8] [¶] The *Dictionary of Occupational Titles* (DOT) describes the work requirements of thousands of jobs as they are generally performed.  Based on my own independent review of the DOT, I find the claimant's past relevant work most resembles that of Receptionist (DOT 237.367-038), which is classified as sedentary, semi-skilled work, with a Specific Vocational Preparation level of four, which requires about three to six months to learn the job (*See also* Exhibit 1A). [¶] In comparing the claimant's residual functional capacity with the demands of this work, I find that the claimant is able to perform it as generally performed, despite the claimant's description of her work as it was actually performed.  As the law provides, the claimant must show that she could not perform her past relevant work as it

---

7    [See AR 105, 113].

8    [See AR 116].

is customarily performed.   Accordingly, I find that the claimant is able to perform her past relevant work.
(AR 19).

Contrary to Plaintiff's contention, the ALJ was not required to consult a vocational expert at step four of the analysis.   See Hopkins v. Astrue, 227 Fed.Appx. 656, 657 (9th Cir. 2007)("[T]he ALJ was not required to call a vocational expert at step four."); Toruno v. Colvin, 2013 WL 4789928, *4 (C.D. Cal. Sept. 9, 2013)(same); see also 20 C.F.R. § 404.1560(b)(2) (To determine whether a claimant can do his her past relevant work, the Commissioner "may use the services of vocational experts . . ., **or** other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether [he or she] can do [his or her] past relevant work, given [his or her] residual functional capacity.")(emphasis added).

Plaintiff mistakenly contends that the ALJ needed to call a vocational expert to help determine Plaintiff's RFC (see Joint Stip. at 27 ["Plaintiff's limitations are not accurately described without vocational testimony."]).   First, Plaintiff has failed to specify what non-exertional limitations the ALJ failed to consider in determining whether Plaintiff could perform her past relevant work.   Second, the ALJ, not a vocational expert, was exclusively responsible for determining Plaintiff's RFC.   See 20 C.F.R. § 404.1546(c).

Since the ALJ found that Plaintiff could perform her past relevant work at step four, the ALJ was not required to consult a vocational expert at step five.   See Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996)(holding that the ALJ's determination that at step four that the claimant could perform past relevant work "made it unnecessary for the ALJ to proceed to the fifth step to determine whether he had the residual functional capacity to perform other work."); Matthews v.

<u>Shalala</u>, 10 F.3d 678, 681 (9th Cir. 1993); 20 C.F.R. § 404.1520(f). Accordingly, the ALJ did not err in failing to obtain the testimony of a vocational expert.

**ORDER**

For the foregoing reasons, the decision of the Commissioner is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: June 16, 2015

/s/
ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE
